MACARIO PERES ROMERO v. STATE OF NEBRASKA.

FILED OCTOBER 2, 1917. No. 20169.

1. **Homicide:** COMMON DESIGN. When two or more, in furtherance of a common design, enter upon the perpetration of a burglary, armed and prepared to kill if opposed, and while so engaged are discovered, and in the effort to escape one of the burglars shoots and kills one who is trying to arrest him, all are equally guilty of the homicide, although one of them, who was not armed with a deadly weapon, escaped before the shooting, and such killing was not part of the prearranged plan.

2. Instruction set out in the opinion, while not approved of, *held* not to have been prejudicially erroneous.

ERROR to the district court for Douglas county: WILLIS G. SEARS, JUDGE. *Affirmed.*

*Richard S. Horton,* for plaintiff in error.

*Willis E. Reed, Attorney General,* and *John L. Cutright, contra.*

CORNISH, J.

At 2 o'clock in the morning of January 21, 1917, Cornelius E. Cross, watchman of the Chicago, St. Paul, Minneapolis & Omaha Railway Company, was shot and killed when he was attempting to arrest three men whom he then dis- covered in the act of robbing a car which they had broken and entered. The defendant (plaintiff in error) was one of the three men. In his brief it is stated: "The theory of the defense, supported by evidence, was that defendant was present unwillingly; that he had no gun; that he was anxious to go home; and that he ran away as long as five minutes before Cross was shot." It is uncertain who fired the fatal shot. The burglars had at least one gun, and de- fendant knew it. In defendant's confession, admitted in evidence over his objection, he stated that he fired the shot; but, according to his testimony on the witness-stand, he was coerced to join in the burglary by one of his com- panions, and ran away before the homicide. It is argued that if he was guilty at all it was as a coconspirator, and that whether the act of Lopez, who, defendant says, did fire the shot, was within their common purpose when the three went to the railroad yards, was a question for the jury, which, it is contended, the court, by refusing to give instruction No. 2 requested by defendant, excluded from the jury. Instruction No. 2 is as follows:

"You are instructed that even if you find that the de- fendant Macario Peres Romero and the other parties named in the information (naming them), on the occasion of the homicide, entered upon the premises with the common pur- pose of burglary, and the violence of the prisoner's com-

panion was merely the result of the situation in which he found himself, and that he proceeded from the impulse of the moment without any concert, then the prisoner would be entitled to an acquittal and discharge.".

It will be noted that the instruction requested hardly bears upon the defendant's theory of the defense. It assumes a common purpose of burglary, and merely raises the question whether there must be concerted action in the shooting.

If one participating in a burglary would shoot and kill an enemy, whom he saw across the street, out of malice, and not in furtherance of the common design, then one would say his companions would not share the guilt of the killing; but if, on the other hand, the one killed was an officer attempting to arrest the lawbreakers, then one would say that his companions would share the responsibility and guilt of the killing, even though the killing had not been planned or expected by them. Both in morals and in law, if a man means one wrong and does another, he is punishable. This is true as to the individual, even though the killing may be unintentional or even accidental. Where one shares with others in the burglarious intent and act, and killing results from it as one of its natural, ordinary and probable consequences, he will not be heard to say that he did not intend or share in it. In the instant case, the plaintiff by his own testimony knew that his companion had a gun. He was bound to know that his companion might use it in resistance of an officer who might attempt to arrest him. The attempt to arrest is an interference with their plans. It is common experience that persons engaged in committing a felony may kill those who interfere. Such appears to be the general, though possibly not the universal, holding of the courts. *Conrad v. State,* 75 Ohio St. 52; *People v. Vasquez,* 49 Cal. 560; *Moody v. State,* 6 Cold. (Tenn.) 299; *McMahon v. People,* 189 Ill. 222; *State v. Nash & Redout,* 7 Ia. 347; *Miller v. State,* 25 Wis. 384; *Commonwealth v. Major,* 198 Pa. St. 290.

The instruction requested is bad for another reason. It has the court assume that Cross was killed as the result of

the violence of the defendant's companion. The jury might very well from the evidence have found that it was the defendant who did the killing.

The court's instruction No. 13, the last sentence of which is complained of as prejudicial error, is as follows: "You are instructed that under the law of this state, in weighing the testimony of police officers and detectives, greater care should be used because of the natural and unavoidable tendency of such persons to procure and remember with partiality such testimony as would be against the defendant. This instruction is not intended to either impeach or discredit the testimony of police officers either severally or collectively, but only as a reasonable caution for you to have in mind."

It is said: "Why should police officers be singled out and made the subject of an instruction if not to cast some discredit upon their testimony?" While we hardly approve of the last sentence of the instruction, yet we are of opinion that the purpose of such instruction is not to either impeach or discredit any particular testimony. It is a cautionary instruction to the jury, advising them of the care they should use in considering the particular testimony. The fact that a witness is interested in the event of the lawsuit calls on us to exercise extra caution in considering his testimony, but can hardly be said to impeach or discredit it.

The judgment of the district court is

AFFIRMED.

HAMER, J., concurring in the conclusion, but criticizing certain of the instructions used by the district court.

I concur in the conclusion reached by the majority opinion, but I am not fully in accord with all that is said, and I think that the district court was unfortunate as to certain of the instructions given. I deem it my duty to protest against some of the views expressed in the instructions, and I realize that such instructions may properly be criticized, although perhaps not sufficiently prejudicial to the plaintiff in error in this case to warrant a reversal of the judg-

ment. No law-abiding citizen sympathizes much with a burglar who goes out with a clearly defined purpose to break in and steal other peoples property, although the same is being carried in cars, and who gets into a bad predicament because of his wicked and lawless purposes, and the conduct of his vicious and lawless associates. Nevertheless it is the duty of each of the members of this court to examine the record carefully and to ascertain, if possible, whether the defendant had a fair trial in the district court, and, if he did not, then there should be a new trial, unless the errors complained of were without prejudice to the defendant. The defendant claims that he was acting under duress. He says that he was compelled to do that which he did. The defendant by his counsel, the public defender, requested the giving of the following instruction: "If you find that the part taken by the defendant in the commission of the crime was under duress and was not voluntary, then there would be no such intent as the law requires to constitute the crime charged."

The defendant received all he asked as to the giving of this instruction, and it may not have been necessary to refer to it in the majority opinion as the most such reference might accomplish would be in the direction of showing that the district court tried to be fair. It is claimed by the defendant that the trial court refused to submit to the jury the defendant's theory of the case. The giving of this instruction shows that he did submit that part of the defendant's theory relating to the alleged duress, but I am not fully satisfied that he submitted the other parts belonging to such theory as they ought to have been submitted, and yet perhaps there was no error.

As I understand counsel for the defendant, the defendant, with two others, succeeded in breaking into a box car standing in the yards of the Chicago, St. Paul, Minneapolis & Omaha Railway Company at Omaha, Nebraska, and they took merchandise out of the car. They were discovered, and the man who was killed knocked one of the two men down with his revolver. The defendant made his escape

and ran away. A few minutes after he ran away, the watchman was shot and killed by one of the burglars, who appears to have been in the car. The difficult part of the case is touching the question concerning whether a man should be held liable for an offense which he never intended to commit and in which he did not participate. Where burglars contemplate breaking into a dwelling house, and do so, and are attempting to remove goods in the house, and meet with resistance, and one of their number kills an occupant of the house, all are guilty if a killing occurs, and without reference to which one did the shooting. It must be held that if they went to commit a felony that they must have contemplated that there would be resistance when those living in the house were disturbed, and that it was contemplated that they would defend themselves, and that one or more might shoot if he deemed it necessary. The same principle should apply to the breaking into a car containing goods being transported for the benefit of the owner. But if the men who undertake to break into a car and to steal from it had no reason to suppose that it was guarded, and had no knowledge or reason to expect that the possession of the goods would be defended, then a different question is presented. Those who go to a dwelling house have reason to suppose that it is occupied by persons, unless they know to the contrary, and it will be presumed that they intended to do what they did; but when a thief goes to a box car standing on a railroad track, can it be presumed that he ought to know that the car was guarded and that the watchman or watchmen guarding the car would be likely to interfere with him? The point in favor of the defendant is that he might have gone to break into a box car and steal from it without the expectation of meeting any one, and without intending to shoot anyone, and without contemplating that his associates or either of them would shoot any one. In such case he might say that there was no objection on his part to breaking into the car and taking the merchandise out of it, but at the same time he did not want to shoot any one. It is a serious thing to be tried for murder in the first

degree and found guilty and sentenced to the penitentiary for life.

As I understand certain of the instructions given by the court to the jury, the jury were told, in effect, that if the defendant participated in the burglary it was immaterial whether he was present at the time of the shooting, and, although he had gone away and may never have contemplated the shooting, he would be guilty anyway if he had participated in the burglary.

The fourth instruction given by the court upon its own motion reads: "You are instructed that the statute of the state of Nebraska, defining the crime of murder, in so far as the same is charged against this defendant, provides as follows: 'Whoever shall * * * in the perpetration of or attempt to perpetrate * * * any burglary * * * kill another, * * * every person so offending shall be deemed guilty of murder in the first degree, and upon conviction thereof shall suffer death or shall be imprisoned in the penitentiary during life, in the discretion of the jury.' In this connection you are instructed that it makes no difference at what stage of the attempted burglary, if you find from the evidence, beyond a reasonable doubt, one was attempted, the shooting took place, as long as such design and attempted burglary had progressed to some extent, in the manner and form charged."

The first part of the instruction confines the killing to the fact that it is in the perpetration or attempt to perpetrate the burglary. Now, can it be said that it is in the perpetration or attempt to perpetrate the burglary, when it is after the breaking and after the defendant has run away that the shooting occurs by another one of the burglars? It is easy to understand that the minds of the burglars met when they concluded to perpetrate the burglary, but one of them has run away and has been gone perhaps several minutes, and a new condition presents itself to the burglar who remains and who shoots; how can the other burglar know anything about it? Is this not punishing the man who has run away for the evil design and murder-

Romero v. State.

ous intent of the man who remained and who, whether justifiable or not, was confronted with a condition that had not existed up to the time that the man ran away? Conditions were apparently threatening for the man who remained. The man who was killed had knocked down one burglar, and he appears to have been lying quiet and the other burglar, who was in the car, might readily conclude that there were hostilities so far as he was concerned. Then he shoots. His case is not before us. We are not called upon to say whether his shooting was justifiable or not. But the condition that presented itself to him never presented itself to this defendant, because he had run away and was not in the immediate neighborhood. When the court said in the above instruction that "it makes no difference at what stage of the attempted burglary the shooting took place," as long as such burglary had progressed to some extent, he was telling the jury that, although the defendant had run away and was not there, yet if the car had been opened and there had been an attempt to rob it then he is to be found guilty of the shooting, although he may never have contemplated it.

The men who are willing to acquire property unlawfully, even to the extent of stealing it, are many perhaps, while only a comparative few would be willing to commit murder for the purpose of adding to their possessions. The purpose of the trial judge, as it appears in the above instruction, is further corroborated by the seventh and ninth instructions given by the court on its own motion. In the seventh instruction the court said: "The state is neither required to charge in the information, nor to prove at the trial, that the act of killing alleged was done purposely or of deliberate and premeditated malice." This was repeating in a way all that had been said in the former instruction, and it was telling the jury that, however sudden and unpremeditated the shooting had been by the man who remained behind, yet the defendant was liable for all of it. It is still further emphasized by the statement of the court in the eighth instruction "that where two or

101 Neb.—42

more persons associate themselves together with intent to commit a burglary * * * all such persons are equally guilty, though one or more of them had not previously consented to the killing, and took no active part in actually producing the death."

That the purpose was to tell the jury that the defendant was equally guilty, whether he contemplated the killing or not, and whether he was there or not, is shown by the refusal of the court to give the second instruction requested by the defendant. The request was, in substance, that if the defendant's companions and the defendant entered upon the premises "with the common purpose of burglary, and the violence of the prisoner's companion was merely the result of the situation in which he found himself, and that he proceeded from the impulse of the moment without any concert," then the prisoner should be acquitted. Perhaps all the foregoing was not prejudicial, if the record contained evidence of a character tending to show that the defendant actually was on the ground, and that he participated in the conflict. I am not at all certain that the record discloses that fact; it is probably very doubtful; but the trial court and the jury were there, and they had the opportunity to hear the testimony and to determine its credibility.

Where the unlawful act agreed to be done is not of a dangerous or homicidal character and its accomplishment does not necessarily or probably require the use of force or violence which may result in the taking of life unlawfully, no such criminal liability will attach merely from the fact of having been a party to such an agreement. 1 Bishop, Criminal Law (7th ed.) sec. 641; 2 Hawkins P. C. (Eng.) ch. 29, secs. 19-21; *Regina v. Franz,* 2 F. & F. (Eng.) 580; Roscoe, Criminal Evidence (13th ed.) 673-675; *Lamb v. People,* 96 Ill. 73; *People v. Knapp,* 26 Mich. 112; *McLeroy v. State,* 120 Ala. 274.

But there is still a further instruction which deserves to be considered. Upon its own motion the court gave the following: "You are instructed that under the law of this

state, in weighing the testimony of police officers and detectives, greater care should be used because of the natural and unavoidable tendency of such persons to procure and remember with partiality such testimony as would be against the defendant. This instruction is not intended to either impeach or discredit the testimony of police officers, either severally or collectively, but only as a reasonable caution for you to have in mind."

There is some objection to the first sentence of the instruction; but, after having given it, it might be argued with considerable effect, and I doubt if any one may show to the contrary, that the purpose was to say to the jury that, although these men by reason of their occupation have an unavoidable tendency to procure and remember with partiality such testimony as is against the defendant, yet you will believe all that they have said anyway. *Preuit v. People*, 5 Neb. 377; *Kastner v. State*, 58 Neb. 767; *Sandage v. State*, 61 Neb. 240. To use an English expression, the district judge came very near "misdirecting himself." It is always a dangerous thing to suggest to a jury how it may avoid an established principle and go around it. The most skilful use of language is hardly adequate to the task.

The language used in *Preuit v. People*, 5 Neb. 377, is not the same as that used in this case and is much more vigorous. It gives the true reason for the greater care to "be used by the jury in relation to the testimony of persons who are interested in, or employed to find, evidence against the accused * * * because of the natural and unavoidable tendency and bias of the mind of such persons to construe everything as evidence against the accused, and disregard everything which does not tend to support their preconceived opinions of the matter in which they are engaged." In the instant case it is said in the instruction that greater care should be used in weighing the testimony of police officers and detectives than other witnesses, but in the *Preuit* case one reason is given, and in the case at bar another reason is given. In the *Preuit*

case it is bias of the mind to construe everything as evidence against the accused and to disregard everything which does not tend to support their preconceived opinions. In that case the jury are told that police officers are partisans and against the accused because of their bias and interest in the case, and so there should be caution in weighing their testimony. But in the instant case the instruction given says nothing about bias of the mind to construe anything as evidence against the accused. The only thing charged is remembrance with partiality of such testimony as might be against the defendant. In the second sentence, even the very tame statement that the testimony of police officers should be weighed with care is modified by the second sentence which, however well intended, is likely to take away from the jury any caution with respect to such testimony. Notwithstanding all that I have said, I am not quite clear that the instructions given were so prejudicial as to demand and require a reversal of the judgment.